## LAFAYETTE STEEL ERECTORS, INC., Plaintiff,

v.

## ROY ANDERSON CORP., Defendant.

### No. Civ.A. 1:96–CV–65RG.

United States District Court,
S.D. Mississippi,
Southern Division.

Nov. 14, 1997.

---

Mark Douglas Herbert, Todd I. Woods, McGlinchey Stafford, Jackson, MS, Paul J. McMahon III, Allen & Gooch, Lafayette, LA, for plaintiff.

David W. Case, Samuel C. Kelly, Ott & Purdy, Jackson, MS, Jess Hays Dickinson, David P. Sullivan, Page, Mannino, Peresich, Dickinson, McDermott, Newton & Huff, Gulfport, MS, for defendant.

## MEMORANDUM OPINION

DAN M. RUSSELL, Jr., District Judge.

This matter has been submitted to the Court on the memoranda and exhibits of the parties for a determination of the issues of fact and law.

### Facts

#### I. Stipulations.

The following facts are set out in the Pre-trial Order as stipulated by the parties:

A. Plaintiff, is a Louisiana corporation whose principal place of business is in the Parish of Lafayette, but which is authorized to do, and actually is doing business within the State of Mississippi.

B. The defendant is a Mississippi corporation whose principal place of business is in the State of Mississippi.

C. The plaintiff and defendant entered into a written contractual agreement whereby the plaintiff was to furnish specified labor, equipment and material to the defendant in connection with the construction of a project known as Treasure Bay Casino and Resort in Robinsonville, Mississippi.

D. The plaintiff fully completed all of its obligations under its subcontract with the defendant.

E. As of the date of completion of the plaintiff's subcontractual obligations, there was a balance remaining on the plaintiff's subcontract in the principal sum of $512,899.48.

F. The owner of the Treasure Bay Casino project, Treasure Bay, Inc., has filed for relief under the United States Bankruptcy Code and has not paid the $512,899.48 to Anderson.

#### II. Findings of the Court.

The following facts are those determined by the Court from the exhibits and depositions placed in the record by the parties:

On September 27, 1993, the parties entered into a written subcontract wherein at Article 13, in pertinent part, it is set out:

The Amount will be paid as follows: Monthly payments will be made for 90% of the work approved by the GENERAL CONTRACTOR, and the Owner's authorized representative, within ten days after the GENERAL CONTRACTOR receives payment from the Owner for the SUBCONTRACTOR'S work. Final payment will be made within ten days after the GENERAL CONTRACTOR receives final payment from the Owner providing the entire amount of work to be done hereunder has been accepted by

the Owner and a complete release of any and all claims against the GENERAL CONTRACTOR has been delivered by the SUBCONTRACTOR to the GENERAL CONTRACTOR (the acceptance of such release shall not relieve SUBCONTRACTOR of liability for defects in said work which may thereafter be discovered) and the GENERAL CONTRACTOR has not received any notice of any outstanding bills against the SUBCONTRACTOR on this project. SUBCONTRACTOR agrees to await payment to the GENERAL CONTRACTOR by the Owner, unless the non-payment is not caused by the SUBCONTRACTOR, in which case the GENERAL CONTRACTOR then agrees to pay the SUBCONTRACTOR within 10 days of written request for payment. If, however, the cause of non-payment is a result on the insolvency of the Owner, the CONTRACTOR agrees to use whatever reasonable means that are available to pursue payment to the SUBCONTRACTOR by the Owner.

Plaintiff submits, as Exhibit 3 to it's trial brief, a computer print recap of pay requests submitted by the plaintiff to the defendant and amounts received by the plaintiff under the terms of the subcontract. According to entries of said exhibit, the defendant initially complied by paying the plaintiff 90% of amounts invoiced; making payments during the months of December, 1993 through March 10, 1994. These payments were for work done and invoiced from the beginning of the contract to November 24, 1993. However, according to the recap, the plaintiff received no significant payments from March 10, 1994 until August 29, 1994; at which time a lump sum of approximately $100,000.00 was paid on invoices submitted during December 1993.

Finally, said Exhibit 3 indicates that, as to invoices submitted from January, 1994 through March 14, 1994, the defendant made no further payments until September 9, 1994, at which time the sum of $394,388.00 was paid. The plaintiff continued to bill the defendant during the following months; however, no further payments have to date been made on the outstanding remaining balance.

According to the deposition testimony of Ronnie Prudhomme, at page 14, "[b]y February, 1994, the plaintiff had completed the performance of all of its work under the subcontract." This testimony is uncontroverted by the defendant and no where is it alleged that the plaintiff's work under the agreement was not satisfactory.

The record does not specifically set out when the owner applied for protection under the bankruptcy laws. It is clear, however, that after the plaintiff finished its part of the project satisfactorily, but before the owner indicated its alleged insolvent condition, the defendant had been paid for forty-three (43) percent of the total cost of the project. It is also admitted that the $394,388.00 sum was calculated as the amount of money needed to bring the total amount paid to the plaintiff up to forty-three percent of the total value of the plaintiff's work.

### Discussion and Conclusions of Law

*I. Effect of Plaintiff's Negotiation of September 9 Check.*

Although it is also hornbook law, the Court notes that the Mississippi Supreme Court, speaking in *Anderton v. Business Aircraft, Inc.,* 650 So.2d 473, 475–476 (Miss.1995), succinctly set out:

" 'Any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties.' "*Kelso v. McGowan,* 604 So.2d 726, 731 (Miss.1992), quoting 3A. Corbin, Contracts § 574 at 373–75 (1960). In order for such a subsequent agreement to effect a modification, it must meet the requirements for a valid contract. *Singing River Mall v. Mark Fields, Inc.,* 599 So.2d 938, 947 (Miss.1992). A valid contract requires an offer and acceptance. *R.C. Const. Co. v. National Office Systems,* 622 So.2d 1253, 1255 (Miss.1993),

citing *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir.1981).

It is also unquestionable that any attempt to modify a written contract "must be supported by new or additional consideration." See *Iuka Guar. Bank v. Beard*, 658 So.2d 1367, 1372 (Miss.1995). And while this consideration need not be equal in value to the corresponding promise, it must consist of either a "benefit to the promisor or [some] loss, detriment, or inconvenience to the promisee." *Id.*

The only questions which must be answered for a determination of this issue are (1) whether or not there was a meeting of the minds of the respective parties, i.e., an offer and acceptance, and (2) whether or not the check constituted a new or additional consideration.

■ Looking first to the second question, the Court reiterates its prior finding that the defendant has never questioned the fact that the plaintiff's work was satisfactorily completed prior to the offer to amend and that no real dispute existed (or exists) as to value of the plaintiff's work pursuant to said subcontract. The foregoing is buttressed by the defendant's own words in its letter of September 2, wherein the $349,388.00 is characterized as "partial payment." Also, in its Memorandum In Support Of Submission For Determination, at page 2, the defendant strongly implies, if not expressly admits, that the amount was determined to be 43% of the outstanding balance due the plaintiff. The plaintiff, in turn, agreed that the sum of $394,388.00 constituted "partial payment." Finally, by its letter of September 7, 1994, the defendant's agent states: "We have enclosed herewith a check in the amount of $394,-388.00, **representing amounts due you through all applications to the owner for which we have been paid either in full or in part.**" (emphasis added)

The foregoing clearly establishes that the subject monies were owed to the plaintiff and constituted only partial payment.

Therefore, said sum cannot constitute separate consideration for a new agreement. Lacking the element of separate consideration; the proposed amendment is without legal effect and cannot be enforced.

■ Regarding the question of the meeting of the minds, it cannot be seriously questioned that the plaintiff, by its immediate response to the defendant's September 2, 1994 letter proposing an amendment to the 1993 subcontract, declined the proposal. Not only did the plaintiff, by its President's letter of September 2, decline the new terms, it also specifically reaffirmed its preference to abide by the terms of the original contract. The only remaining question regarding acceptance of the proposal is whether the negotiation of the check constitutes an accord and satisfaction equivalent to a constructive acceptance.

■ The defendant cites, as authority that the negotiation of the check, in light of the accompanying letter, *Lovorn v. Iron Wood Products Corporation*, 362 So.2d 196 (Miss.1978). Although Lovorn is good authority for the elements of accord and satisfaction, it is clearly inapplicable herein. Although the Court declines to address each and every element, suffice it to say that the facts herein fail to support a finding that the subject check was offered "in full satisfaction" of the plaintiff's demand. As previously noted, both parties recognized it as merely a "partial payment" of an outstanding larger sum. Therefore, this Court finds no merit in the defendant's argument and concludes that the September 2, 1994 proposal to amend the September 1993 subcontract was ineffective.

## II. Is Article 13 a "Pay if Paid" clause?

Curiously, the defendant asserts in its Response to Plaintiff's Trial Memorandum that "Ronnie Prudhomme, the Vice–President of Lafayette Steel, acknowledged that this Subcontract contained 'pay-if-paid'

language in his deposition. (Ronnie Prudhomme Depo. p. 9)" This Court's reading of that page, as well as the entire deposition of September 13, 1996, finds no support for such an allegation. The colloquy to which the defendant apparently refers begins at page 9 and continues on page 10 of said deposition, wherein the following, relevantly and in pertinent part, is found:

Q. Okay. Do you agree that article thirteen of this contract constitutes a pay if paid clause?

**Mr. McMahon:**

I will object to the form of the question. You're asking for a legal conclusion, he's not a lawyer.

**By Mr. Sullivan:**

Q. Okay. Then how do you interpret article thirteen as to what it means to Lafayette Steel?

A. I feel that it means that within ten days of a notice to the general contractor of nonpayment of a written request from us for payment, that we would be paid.

Q. Okay. How is it that affected by the owner's insolvency?

A. The way I would interpret this is that if the owner would become insolvent, that within a reasonable period of time we could make a demand and be paid by the contractor, whoever, the person we have a contract with.

As both parties have found and as supported by this Court's research, Mississippi case law, whether state or federal, contains no clear direction on the issue. However, of interest to this Court is the fact that the majority of courts from other jurisdictions which have addressed the question of whether or not a particular agreement could shift the burden for obtaining payment from the owner from the contractor to the subcontractor, have so found only when the language of the subcontract unequivocally sets out such.

Interestingly, this Court's extensive research reveals that the term "pay-if-paid" is seldom specifically used in opinions.

The discussions generally concentrate on whether or not a "pay-when-paid" clause is phrased so as to leave no doubt that the contractor's receipt, if at all, of monies from the owner constitutes a condition precedent on the contractor's duty to pay the subcontractor.

The majority rule regarding how the courts construe pay-when-paid provisions is that such only grant the contractor a reasonable time to effect payment and do not re-assign the risk of nonpayment to the subcontractor. The seminal case for this principle is *Thos. J. Dyer Co. v. Bishop International Engineering,* 303 F.2d 655 (6th Cir.1962). *Dyer* has been cited and relied upon repeatedly during the intervening thirty plus years preceding this cause and it and its progeny have served both as a caveat to those in the construction business wishing to spread, if not shift, the risks of doing business to subcontractors as well as a general guide to effective drafting of contract language.

■ One of the considerations repeatedly found in those cases in which the language in question has been determined to be ineffective in shifting the risk to the subcontractor is that contract clauses which create conditions which might result in a forfeiture are not favored and will be strictly construed. As noted by the plaintiff, this principle has been adopted by the courts in Mississippi. See *Garner v. Stuart Co.,* 222 Miss. 290, 75 So.2d 747 (Miss.1954) and *Board of Sup'rs of Franklin County v. Newell,* 213 Miss. 274, 56 So.2d 689 (1952).

It is also emphasized that, as matter of practice, the subcontractor looks to the contractor for compensation and not to the owner; an entity with whom the subcontractor, as herein, normally has only indirect dealings.

The challenge to the Court as well as to the draftsmen of contracts is to determine what combination of phrases and terms convey the intent of the contracting parties.

Of the many cases perused by this Court in its effort to reach its conclusion in this cause, one which the Court finds instructive is *Gulf Construction Company, Inc. v. Self,* 676 S.W.2d 624 (Tex.App.—Corpus Christi 1984), wherein that court set out in pertinent part:

> While no particular words are necessary for the existence of a condition, such terms as "if," "provide that," "on condition that," or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise. In the absence of such a limiting clause, whether a certain contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties.

*Id.* at 627.

The *Gulf Construction* case is instructive largely due to the fact that the court examined a sentence which, standing alone, would have appeared to have clearly constituted a condition precedent, but when read in the context of the entire contract was found to be "in the nature of a modification of the time provision which immediately precedes it. . . ." *Id.* at 629.

Two other cases are deemed noteworthy by this Court for the reason that together they serve to show that, notwithstanding the majority position followed by the forum state (Florida in this instance), the contractor may, if he chooses, declare his intent with clarity and in so doing will be upheld.

In *Peacock Construction Co. v. Modern Air Conditioning, Inc.,* 353 So.2d 840, 842–843 (Fla.1977), upon finding against the contractor and following *Dyer,* supra, the court further explained:

> Our decision to require judicial interpretation of ambiguous provisions for final payment in subcontracts in favor of subcontractors should not be regarded as anti-general contractor. It is simply a recognition that this is the fairest way to deal with the problem. There is nothing

in this opinion, however, to prevent parties to these contracts from shifting the risk of payment by the owner to the subcontractor. But in order to make such a shift the contract must unambiguously express that intention. And the burden of clear expression is on the general contractor.

Next the Court looks to *Wilson, Inc. v. Post–Tensioned Structures,* 522 So.2d 79 (Fla.App. 3rd Dist.1988), wherein, while recognizing the teachings of *Peacock,* made short work of finding that finding that the contractor had met its burden.

This Court elects not to recite specific portions of contracts in which courts following the majority rule have upheld the contractors contention that the duty to pay the subcontractor was conditioned upon it being paid first by the owner. The principle reason being that in the case at bar the language in question is not, in this Court's opinion, close enough to merit extensive comparison and secondarily due to concern that this Court might be seen as dictating the standard to be followed in all cases.

■ Turning to the language under review, as previously set out hereinabove, it is the finding of this Court that although the last sentence in Article 13 begins with the term "If," it does not change the fact that the three preceding sentences; convoluted as they are, essentially inform the subcontractor of what he must do to get paid promptly by the contractor. Furthermore, it is even emphasized that if the subcontractor does no wrong that he will receive, from the contractor, final payment within ten days of his submission of request for payment. It is then offered by the contractor, in the event of the owners insolvency, that it will "use reasonable means" to get the owner to pay the subcontractor. This Court's opinion and holding is that such offering, in light of the preceding language, is nothing more than an offer by the contractor to act responsibly in obtaining funds due the subcontractor; something which it is presumed to be doing all along. It does not constitute a

condition precedent; imposing upon the subcontractor the duty of dealing with the contractor or of waiting, for an unreasonable time, for the contractor to receive payment from the owner.

■ It is therefore the holding of this Court that the subcontract of September 1993, is the agreement controlling the acts of the parties and that such agreement is in the nature of a "pay-when-paid" contract allowing the defendant a reasonable amount of time to pay the plaintiff for work done pursuant to the subcontract.

### III. Final Amount Due and Owing.

As set forth in the Pre–Trial Order of January 10, 1997, both in the "concise summary of ultimate facts claimed by: [plaintiff] and in the facts [ ] established by the pleadings or by stipulation or admission," the balance due on the plaintiff's subcontract is asserted to be $512,899.48. The Court therefore is puzzled that the plaintiff now, in its Trial Memorandum and Rebuttal Memorandum, asserts that "[it] is not disputed that there remains an outstanding and unpaid contract balance due Lafayette Steel in the amount of $540,-123.74." (Plaintiff's Rebuttal Memorandum at page 12). The Court is even more puzzled by the plaintiff's citation, in both pleadings, to the Pre–Trial Order at 8E as authority.

A review of the pleadings on file in this matter reveals that the initial Complaint was filed on January 29, 1996; in which pleading the plaintiff prayed for relief in the sum of $573,738.47. Several months into the matter, the plaintiff sought and obtained permission to file its First Supplemental And Amending Complaint; filing same on April 19, 1996. The sole purpose for the amended complaint was clearly to alter the amount of the principal sum previously alleged as due and owing from the defendant from $573,738.47 to $512,899.48. Said change was made to all three paragraphs in which the former sum was set out.

This civil action, as has been the procedure followed in this Court, District and Division since the adoption of the Uniform Civil Justice Expense and Delay Reduction Plan, has been shepherded patiently through the system. The Court has been cooperative and understanding during the delays caused, in part, by the plaintiff's attempt to settle on its choice of counsel, notwithstanding its being pushed into sanctioning the plaintiff monetarily for forcing the defendant to file a motion to compel discovery. The Court is therefore not pleased that, in spite of its curious assertion that the liquidated amount is not disputed, the plaintiff for the first time, in a cover letter accompanying its Rebuttal Memorandum, seeks a hearing on said amount. This dilatory action is not what the framers of Rule 16(e) or the construing courts had in mind as justifying an eleventh hour request for withdrawal of a matter stipulated to.

Rule 16(e) Pretrial Orders, of the Federal Rules of Procedure provides:

After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of action unless modified by subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

Since being first promulgated in 1938, Rule 16 has been amended three times; specifically in 1983, 1987 and 1993. Section (e) was last amended in 1983 and, as set out in the Advisory Committee Notes: "No compelling reason [was] found for major revision, especially since this portion of the rule has been interpreted and clarified by over forty years of judicial decisions with comparatively little difficulty." Continuing, the Committee notes:

Once formulated, pretrial orders should not be changed lightly; but total inflexibility is undesirable. See, e.g., *Clark v. Pennsylvania R.R. Co.*, 328 F.2d 591 (2d Cir.1964). The exact words used to describe the standard for amending the

pretrial order probably are less important than the meaning given them in practice. By not imposing any limitation on the ability to modify a pretrial order, the rule reflects the reality that in any process of continuous management, what is done at one conference may have to be altered at the next. **In the case of the final pretrial order, however, a more stringent standard is called for and the words "to prevent manifest injustice," which appeared in the original rule, have been retained.** They have the virtue of familiarity and adequately describe the restraint the trial judge should exercise.

*Id.* (Emphasis added).

The district court, speaking in *United States v. State of Tex.*, 523 F.Supp. 703, 713 (E.D.Tex.1981) relevantly and in pertinent part summarized as to the legal standards for withdrawing stipulations:

> The Court of Appeals has held that a district court has an affirmative obligation to relieve counsel from pre-trial stipulations where manifest injustice would otherwise result. *Central Distributors, Inc. v. M.E.T., Inc.*, 403 F.2d 943 (5th Cir.1968).

> The burden on a party seeking relief from a stipulation freely entered into before or during trial is a heavy one. As a general rule, such stipulations are controlling and conclusive, resolving all factual issues according to their contents and framing those issues remaining to be tried. See *Downs v. American Employers Insurance Co.*, 423 F.2d 1160, 1164–65 (5th Cir.1970).... Accordingly, evidentiary stipulations may not be tinkered with absent a clear and convincing demonstration that manifest injustice would result. *City of Lakeland, Florida v. Union Oil Co. of California*, 352 F.Supp. 758, 768 (M.D.Fla.1973).

Additionally, this Court notes that the afore cited court further observed:

> As litigation proceeds from the pre-trial phase into trial and beyond, the burden on one seeking to alter or withdraw stipulations of fact necessarily increases in order to protect the integrity of the process to date.

*Id.*

■ It is this Court's holding that the plaintiff's attempt to, as it were at the conclusion of its case, create an issue regarding a fact repeatedly asserted and finally stipulated to is too little too late. As previously noted, the plaintiff has had more than enough time and opportunity to correct this alleged error and this Court's decision to bring the matter to a conclusion can not be said to constitute "manifest injustice."

Therefore, it is the ruling of this Court that the plaintiff is bound by the clear statements set out in the Pre–Trial Order. Furthermore, the Court finds that the amount due and owing under the subcontract is $512,899.48.

### IV. Prejudgment Interest.

To begin with, the Court reiterates its prior determination that the amount due under the subcontract is $512,899.48 and not $540,123.74. It must also therefore find that neither the sum of $194,858.89, as calculated by the plaintiff, for the period May 11, 1994 through October 31, 1997, nor the sum of $121,627.77, calculated for the period September 29, 1995 through October 31, 1997, is correct. Regrettably, the plaintiff does not provide the Court with an alternative set of figures based upon the sum of $512,899.48, as such would have afforded the Court an opportunity to dispose of all issues in one opinion.

The plaintiff asserts and the Court agrees that the parties subcontract incorporates into its provisions the terms and conditions of the prime contract and thereby provides that Lafayette Steel in entitled to the same benefits against Anderson that Anderson would have against the owner. (Plaintiff's Exhibit 1, article 4). Also, the Court agrees with the plaintiff that Article 14 of the prime contract establishes that the prejudgment interest on the liquidated

sum due and owing shall be calculated at a rate of "[t]wo percentage points above prime interest rate as published daily in the Wall Street Journal." (Plaintiff's Exhibit 12, Article 14.2).

On the eve of this Court's issuance of the subject decision, the defendant submits a response to the plaintiff's Rebuttal regarding the liquidated amount and appropriateness of an award of prejudgment interest. As authority for its position that this is not a case in which an award of prejudgment interest is appropriate, the defendant cites *Simpson v. State Farm Fire and Cas. Co.*, 564 So.2d 1374, 1380 (Miss.1990) wherein the Mississippi Supreme Court set out:

> "An award of prejudgment interest rests in the discretion of the awarding judge. Under Mississippi law prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made, or where the denial of the claim is frivolous or in bad faith." *Aetna Casualty & Surety Co. v. Doleac Electric Co.*, 471 So.2d 325, 332 (Miss.1985) (citations omitted). As to whether a claim is liquidated, interest has been denied where "there is a bona fide dispute as to the amount of damages as well as the responsibility for the liability therefore." *Grace v. Lititz Mutual Insurance Co.*, 257 So.2d 217, 225 (Miss.1972).

In addition, the defendant cites *Thompson Machinery Commerce Corporation v. Wallace*, 687 So.2d 149 (Miss.1997) as extending the principle to contract cases.

■ The defendant interprets *Simpson* and *Thompson* as holding that "there must **not be a bona fide dispute as to the** amount or **responsibility for the liability.**" (Defendant's November 13, 1997 response). This Court is not in agreement that these criteria are individually dispositive, but reads the language as collective; i.e. that both must be in dispute. Nonetheless, in either case, the result herein would be the same.

Notwithstanding the plaintiff's ineffective attempt to belatedly create a dispute, the Court has determined, based upon the clear language of the original Complaint as amended by the First Supplemental And Amending Complaint and as stipulated to in the Pre–Trial Order, including the position taken by the defendant regarding the principal outstanding, that there exists no bona fide dispute. In addition the Court has determined that the sole responsibility is and always has been that of the defendant to pay the plaintiff within a reasonable time. Therefore, whether one views the criteria as collective or in the alternative, the fact remains that, as to these two criteria, it is appropriate that the plaintiff be awarded prejudgment interest.

As to the requirement set in Thompson, supra, that a proper demand for prejudgment interest must be in the pleadings, "including from when it is allegedly due." *Id.* at 152, the Court finds that a proper demand has been made. However, as to the question of "from when it is allegedly due," the Court, has been provided with two dates and will, upon receipt of additional data and calculations based upon the $512,899.48 liquidated amount, make a ruling as to which date applies.

The parties are therefore advised that a decision as to the amount of prejudgment interest will be stayed pending the Court's receipt of facts and calculations consistent with the other relevant holding of this opinion.

## V. Has a "reasonable amount of time" elapsed?

■ The plaintiff alleges (and the record supports) that: (1) Lafayette Steel completed its work on the project by February 1994, (2) it submitted its application for final payment in May 1994, (3) Anderson paid $100,000 on August 29, 1994 and $394,388 on September 7, 1994, and (4) that Lafayette Steel waited until September 19, 1995 to make another demand. Therefore, the total elapsed time from the September 1994 up until the filing of the

subject Complaint on January 29, 1996, amounts to just under a year and a half. If one continues to calculate the time period available to the defendant to the present, over three years have passed since the plaintiff received its last payment from the defendant. The defendant does not offer any argument for the proposition that this delay is reasonable and the Court finds no reason on its own. Therefore, the Court agrees with the plaintiff that the defendant has exhausted its "reasonable time" and holds that the liquidated debt under the subject subcontract is past due. In addition, once the parties provide the Court with supplemental data from which a determination of pre-judgment interest on the $512,899.48 liquidated balance may be ascertained, the Court will issue a similar ruling regarding the payment of such interest.

### Conclusion

Based upon the pleadings, memoranda and exhibits presented by the parties to this Court:

**IT IS THEREFORE HEREBY ORDERED AND ADJUDGED** that the subcontract entered into by and between the parties on September 27, 1993, is binding and controlling herein;

**IT IS ALSO ORDERED AND ADJUDGED** that the attempt to amend the September 27, 1997 subcontract by payment of the previously owed $394,338.00 was ineffective;

**IT IS FURTHER ORDERED AND ADJUDGED** that Article 13 of the September 27, 1993 subcontract would under Mississippi law be found to constitute a "pay-when-paid" clause and that such clause affords the contractor/defendant only a reasonable time in which to pay the subcontractor/plaintiff;

**IT IS FURTHER ORDERED AND ADJUDGED** that the liquidated sum due and owing to the plaintiff by the defendant is $512,899.48 as stipulated to in the Pre-Trial Order of January 10, 1997 and that

the "reasonable time" allowed for its payment has elapsed;

**IT IS FINALLY ORDERED AND ADJUDGED** that the terms of subcontract entered into by and between the plaintiff and defendant in conjunction with the contract entered into by and between the defendant/contractor and the owner justifies an award of prejudgment interest to the plaintiff; however, the exact amount of such pre-judgment interest is, absent supplemental information from the plaintiff, not subject to determination by the Court at this time.